Delton York
7500 Callahan Road, Unit 193
San Antonio, TX. 78229
(210) 748-6305
delton.york@yahoo.com

Plaintiff

**FILED**

MAY — 9 2022

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
                        DEPUTY CLERK

SA22CA0451 XR

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS

Delton York,

       Plaintiff,

vs.

KIRAN AHUJA, Director of the U.S. Office
of Personnel Management[1],

       Defendant.

Case No.:

**COMPLAINT FOR DAMAGES**

Plaintiff, DELTON YORK, submits the following Complaint for damages:

### PARTIES

    1.    Plaintiff, DELTON YORK, is an adult African-American male who was formerly employed by the defendant. Plaintiff's race places him in a class of individuals against whom certain discriminatory employment practices are prohibited under Title VII of the Civil Rights Act of 1964.  At all material times alleged in this complaint, plaintiff has resided in the city of San Antonio, Texas, from which he telecommuted and performed the majority of services as defendant's employee.

    2.    Defendant[1] is the current Director of the United States Office of Personnel

---

[1] Pursuant to Fed. R. Civ. P 25(d), the proper defendant to this action is Kiran Ahuja, who was sworn in as the new Director of the U.S. Office of Personnel Management on June 24, 2021.

Management ("OPM"). OPM is an independent agency of the United States Federal Government that serves as the chief human resources agency and personnel policy manager for the federal government. OPM manages civilian service of the federal government, coordinates recruiting of new government employees, manages their health insurance and retirement benefits programs. OPM is also a fiscal procurement agency that generates revenue by charging a fee to other government agencies for providing organizational design, job classification, reclassification services, classification training, and other similar services.

## NATURE OF CLAIM

3.    This case involves an adult African-American male over the age of 40, who was employed by OPM as a career-ladder Human Resources Specialist under its Organization Design & Position Classification ("ODPC") unit. Plaintiff's career-ladder position falls under the 201 series of defendant's General Schedule Human Resources ("HR") Management Group, and is generally described as "GS-201-12/13". The primary and essential functions of plaintiff's position included, but were not limited to, the following non-exhaustive duties: (a) project management, (b) technical consulting services, (c) in-person and virtual desk audits, (d) position classifications, and (e) organizational design. Plaintiff provided these services to various OPM clients which include federal agencies, local and state government agencies, and private contractors that are working on federal projects. As an HR Specialist, plaintiff also served as an instructor for the OPM classification training program and served on a panel that selected administrative judges. It is a technical position, the successful performance of which requires a high level of proficiency.

4.    At the heart of plaintiff's case is the allegation that despite being qualified, OPM did not promote plaintiff to the full GS-13 performance level in his career-ladder position, *in part*, because of unlawful discrimination based on race and age. With respect to his race discrimination claim, plaintiff alleges that OPM failed to promote, applied unequal terms and conditions of employment, gave preferential treatment to similarly situated employees who are not in plaintiff's protected class, and failed to provide career development assignments. Plaintiff also alleges that he was subjected to a pervasively

hostile work environment based on race, and that he was the victim of retaliation based on his engaging in protected activities.

**FEDERAL QUESTION JURISDICTION**

5.      This action is brought pursuant to Title VII of the Civil Rights Act of 1964 for employment discrimination based on race and retaliation, and pursuant to the Age Discrimination in Employment Act ("ADEA"). Federal question jurisdiction is conferred on this Court by 42 U.S.C. Section 2000e-5, and 29 United States Code §623, *et. seq.*

**PERSONAL JURISDICTION**

6.      Defendant OPM purposefully availed itself of the rights and privileges of this forum by employing plaintiff at its branch office located at 8610 Broadway, Suite 305, San Antonio Texas, 78207.  Moreover, a substantial portion of the damages alleged in this action occurred in this forum.

**VENUE**

7.      Venue is proper in this District pursuant to 28 U.S.C. §1391(c) and 42 U.S.C. §2000-5(f)(3), because the acts of employment discrimination alleged herein occurred in the State of Texas, and defendant maintains a business establishment within the City of San Antonio, Texas.

8.      Defendant OPM is a federal government agency, and "person" within the meaning of 42 U.S.C. §2000e(a) and an "employer" within the meaning of 42 U.S.C. §2000e(b). Based on the foregoing, defendant is an entity against whom this action may be commenced.

**INTRA-DISTRICT ASSIGNMENT**

9.      Intra-district assignment is proper in the San Antonio Division of this Court pursuant to Local Rule CV-1, *et. seq.*, because a substantial part of the events which give rise to the claims asserted in this complaint occurred in the City of San Antonio, Texas. In particular, plaintiff performed a substantial portion of his duties as a tele-commuter from his home in San Antonio, at which location OPM committed acts of discrimination in employment as alleged in this complaint.

**ADMINISTRATIVE PROCEEDINGS**

10.      To establish federal subject matter jurisdiction, a plaintiff is required to

1   exhaust administrative remedies before seeking adjudication of a Title VII claim.

2        11.    On October 27, 2014, plaintiff contacted OPM's Equal Employment

3 Opportunity ("EEO") office to report employment discrimination. During the initial

4 interview, plaintiff alleged that, beginning in or about August 2011, OPM engaged in a

5 pattern of discriminatory conduct by refusing to promote plaintiff to the full GS-13

6 performance level of his position despite plaintiff being qualified for the promotion.

7        12.    On November 10, 2014, plaintiff elected to go through the Alternative

8 Dispute Resolution ("ADR") process, however, ADR was unsuccessful.

9        13.    On January 20, 2015, plaintiff timely filed a formal EEO complaint with

10 OPM, alleging that beginning in or about August 2011, OPM engaged in discriminatory

11 conduct by refusing to promote plaintiff to the full performance GS-13 level of his

12 position despite plaintiff being qualified for the promotion. Plaintiff also alleged that

13 discrimination was based on race, color, age and disability. The timely filing of this

14 formal EEO Complaint allowed defendant time to investigate the charge.

15        14.    On January 21, 2015, OPM issued an Acknowledgement Letter to plaintiff.

16        15.    On January 22, 2015, defendant issued partial acceptance of the claims.

17 OPM subsequently investigated the discrimination claims based on race, color, sex,

18 disability and age surrounding the defendant's refusal to promote plaintiff to the full

19 GS-13 level of his position on or about September 16, 2014.

20        16.    On February 26, 2015, plaintiff agreed to postpone the investigation of the

21 discrimination claims for a period of ninety days.

22        17.    From June through October 2015, the defendant's EEO specialist gathered

23 affidavits and relevant documents from plaintiff and defendant.

24        18.    On November 12, 2015, plaintiff filed a timely request for hearing before

25 an administrative law judge ("AJ").

26        19.    From early 2016 through 2018, several of defendant's representatives

27 either withdraw, substituted out or retired from federal sector employment, the result of

28 which was the continued delay of the evidentiary hearing before the AJ.

29        20.    Meanwhile, on June 18, 2018, in anticipation of an administrative hearing,

30 defendant's HR Strategy Group Manager Jason Parman ("Parman") dispatched a group

1   email that included two of plaintiff's designated witnesses, Morris Blakely ("Blakely")
2   and Rachelle Booth ("Booth"). Parman's June 18, 2018 group email divulged
3   confidential ADR information concerning the plaintiff. Parman's June 18, 2018 group
4   email also set forth facts that Parman knew were false. In Parman's June 18, 2018 group
5   email, Parman falsely represented that Parman asked all of plaintiff's acting managers at
6   the mid-year of OPM fiscal year 2014 if plaintiff was qualified for a promotion. In
7   Parman's June 18, 2018 group email, Parman also falsely represented that all of
8   plaintiff's acting managers told Parman that plaintiff was not qualified for a promotion
9   at the mid-year of OPM fiscal year 2014.  Because of the false representations in
10  Parman's June 18, 2018 group email, and the negative impact those false
11  representations had on the EEO process, plaintiff filed a motion for sanctions.

12       21.     On August 19-21, 2019, an in-person evidentiary hearing was finally held
13  at the EEOC San Antonio Field Office. The EEO investigative report was received into
14  the record, as well as other documents relevant to plaintiff's general damages. Prior to
15  receiving testimony, the AJ allowed the representatives to address the issue of plaintiff's
16  motion for sanctions. Appearing in person at the evidentiary hearing were plaintiff,
17  Blakely, Booth, Yvonne Ryan ("Ryan") and Parman, each of whom gave testimony under
18  oath.

19       22.     On September 30, 2019, the AJ issued a partially favorable decision
20  ("Decision"). The decision held that plaintiff did not establish a *prima facie* case of race,
21  color, sex, age or disability discrimination, retaliation or hostile work environment
22  based on race. On the other hand, the AJ issued sanctions against defendant. Sanctions
23  were based on the AJ's finding that Parman provided knowingly false information to the
24  EEO specialist. Sanctions were also issued because of the Agency's repeated failure to
25  schedule a timely hearing. Sanctions included an order that defendant within 45 days:
26  (a) promote plaintiff to the GS-13 grade in his position, (b) pay plaintiff back-pay plus
27  interest from June 18, 2018 to present, and (c) pay plaintiff $30,000 as non-pecuniary
28  damages for emotional distress.

29       23.     Judgment was entered in favor of plaintiff; however, the defendant issued
30  a Final Agency Decision rejecting the judgment.

1   24.    Defendant thereafter appealed the issuance of sanctions, and plaintiff
2   cross-appealed on the AL's finding that plaintiff failed to establish a *prima facie* case of
3   discrimination.

4   ## EXHAUSTION OF ADMINISTRATIVE REMEDIES

5   25.    On July 15, 2021, the OFO affirmed the Administrative Judge's findings
6   that plaintiff failed to establish a *prima facie* case of discrimination, and it also
7   overturned the issuance of sanctions against defendants on the grounds that defendants
8   did not receive adequate notice because sanctions were issued as a default.

9   26.    On August 18, 2021, plaintiff filed a timely Motion for Reconsideration of
10  the OFO's decision dated July 15, 2021. The OFO affirmed its previous decision on
11  March 2, 2022, giving notice of plaintiff's right to file a civil action.

12  27.    This action was filed and commenced within ninety (90) days after receipt
13  of notice of the EEOC OFO decision to affirm the Administrative Judge's decision that
14  found plaintiff failed to establish a *prima facie* case of discrimination and that sanctions
15  were not proper. Based on the foregoing, plaintiff exhausted administrative remedies
16  prior to the commencement of this action, and all conditions precedent to the filing of
17  suit have been performed or have occurred.

18  ## EEO INVESTIGATION AND WITNESS STATEMENTS

19  28.    On July 16, 2015, plaintiff submitted an affidavit and relevant documents
20  to the defendant's EEO specialist with respect to his claims of discrimination.

21  29.    On July 20, 2015, plaintiff's second-line supervisor and HR Strategy group
22  manager, Jason Parman, submitted an affidavit and accompanying documents to the
23  OPM EEO specialist. Parman's affidavit was executed under penalty of perjury, and it
24  set forth facts supporting defendant's refusal to promote plaintiff to the full GS-13
25  performance level of his position. The documents Parman attached to his July 20, 2015
26  EEO affidavit include: (a) "NTEU Guidance on Career Ladder Promotions", a true and
27  correct copy of which is attached hereto as **Exhibit A,** (b) "ODPC Mid-Years FY14", a
28  true and correct copy of which is attached hereto as **Exhibit B**, pp. 1-2 and (c) "Full
29  Performance Level Career Ladder Promotion Justification: Jason (Jay) Hohman", a true
30  and correct copy of which is attached hereto as **Exhibit C**, pp. 1-3.

30.     On September 21, 2015, Blakely submitted an affidavit to the defendant's EEO specialist. Blakely's affidavit sets forth facts relevant to plaintiff's discrimination claim that are based on Blakely's personal knowledge.

31.     On September 30, 2015, Firooz Basri ("Basri") submitted an affidavit to the defendant's EEO specialist. Basri's affidavit sets forth facts relevant to plaintiff's discrimination claim that are purportedly based on Basri's personal knowledge.

32.     On October 5, 2015, Yvonne Ryan ("Ryan") submitted an affidavit to the defendant's EEO specialist. Ryan's affidavit sets forth facts relevant to plaintiff's discrimination claim that are purportedly based on Ryan's personal knowledge.

33.     On October 6, 2015, Booth submitted an affidavit and an accompanying document to the defendant's EEO specialist. The document Booth attached to her October 6, 2015 EEO affidavit include: (a) "Email sent from Parman to Booth on April 21, 2014", and (b) "Email reply from Booth to Parman on April 24, 2014", a true and correct copy of which are attached hereto collectively as **Exhibit D**, pp. 1-3.  Booth's affidavit sets forth facts relevant to plaintiff's discrimination claim that are based on Booth's personal knowledge.

34.     Despite being asked on several occasions, Michelle Acara ("Acara") plaintiff's former first-line supervisor in the ODPC unit, failed to submit an affidavit executed under penalty of perjury to the OPM EEO specialist.

## CRITERIA RE: PROMOTION ELIGIBILITY

35.     The statutory scheme for plaintiff's OPM career-ladder promotion from the GS-12 to the GS-13 grade of his position is codified at Title 5 of the Code of Federal Regulations ("C.F.R.), Section 335.104, which states, in pertinent part, that:

> "No employee shall receive a career ladder promotion unless his or her current rating of record...is "Fully Successful"...In addition, no  employee may receive a career ladder promotion who has a rating below "Fully Successful" on a critical element that is also critical to performance at the next higher grade of the career ladder."

36.     Chapter 335, Subchapter 1, paragraph 1-4(b) of the OPM HR Handbook supplements the requirements of 5 C.F.R. §335, and states in pertinent part, that:

> "An employee selected for a career ladder position
> may be promoted at management's discretion
> without further competition if the employee:
>
> 1. meets regulatory and qualification requirements;
> and
> 2. demonstrates the ability to perform at the next
> higher grade."

37.     Pursuant to Chapter 335, Subchapter 1, paragraph 1-4(b) of the OPM HR Handbook, the term "competencies" is defined as the job-related knowledge, skills and abilities that are used by management to evaluate the OPM career-ladder employee's ability to perform at the next higher grade of the position.  In evaluating the competencies associated with plaintiff's career-ladder promotion readiness from the GS-12 to GS 13 grade of his position, Parman changed the language of the OPM HR Handbook by considering plaintiff's ability to "*succeed*" at the next higher grade of the position, rather than considering the plaintiff's ability to "*perform*" at the next higher grade.

### Performance Evaluation Rating Terms

38.     Based on representations made to plaintiff by Acara at the time of his hire, plaintiff believed that OPM would use the criteria set forth at Chapter 443, Subchapter 5, paragraph 3-2(b) of the OPM HR Handbook to rate the plaintiff's performance respect to plaintiff's career-ladder promotion readiness.

39.     Pursuant to Chapter 443, Subchapter 5, paragraph 3-2(b) of the OPM HR Handbook, relevant criteria to be used to evaluate plaintiff's job performance are:

> "*Outstanding*" means that performance which significantly
> exceeds management expectations and represents a level of
> performance which only a few employees could be expected
> to achieve..."
>
> "*Exceeds Fully Successful*" means performance that is less
> than that needed to satisfy the stringent criteria for
> Outstanding, but is consistently above that required level of
> Fully Successful."
>
> "*Fully Successful*" specifies performance that fully meets the
> requirement of the job. Performance at this level consistently

meets the expectations for the job. Fully Successful denotes solid and consistent performance and should be descriptive of the great majority of the work done by OPM employees."

*"Minimally Successful"* means performance which does not consistently meet the expectations and requirements for the Fully Successful level. This may be evidenced by the need for greater supervisory review, discussion and correction than is necessary at the Fully Successful level. When performance falls below Fully Successful, it may be necessary to take remedial action."

<u>Mandatory Use of Annual Appraisal</u>

40.   According to the defendant's HR Handbook, Chapter 430, Subchapter 5, paragraph 5-5(a), for career-ladder promotions:

*"...the results of the performance appraisals must be used as the basis for determining whether employees have demonstrated the ability to perform at the next higher level of a career ladder...".*

<u>Representations by First-Line Supervisor</u>

41.   Not long after plaintiff was hired by defendant, plaintiff's former first-line supervisor, Michelle Acara, represented that career-ladders are the successive grade levels through which plaintiff could advance noncompetitively to the full GS-13 performance level of his position as an HR Specialist.

42.   Acara also represented to plaintiff that career-ladders are established for recruitment purposes, and are based on a classification decision that sufficient GS-13 level work existed at the time of his hire to support the career ladder hiring decision. Based on representations made to plaintiff by Acara, plaintiff believed that sufficient work existed at the full GS-13 performance level of his position at the time he was hired by defendant in 2010.

43.   Acara also represented to plaintiff that, in accordance with 5 C.F.R. §335.104, and Chapter 335, Subchapter 1, paragraph 1-4(b), plaintiff was entitled to receive a career-ladder promotion after: (a) having served in the position for at least one year, (b) after having received a performance evaluation of *"Fully Successful"* with no evaluation below *"Fully Successful"* in a critical area of performance, and (c) after having demonstrated the competencies to perform position classification and

1  organizational design assignments at the GS-13 level. Acara did not represent to plaintiff
2  that an HR Specialist could receive a career-ladder promotion if that individual served
3  less than one year in his or her position.

4      44.    Acara represented to plaintiff that a *"Fully Successful"* annual
5  performance evaluation means that plaintiff consistently met the expectations of
6  management in that, during the evaluation period, plaintiff had gradually taken on and
7  successfully completed more complex tasks at the full GS-13 performance level of his
8  position as HR Specialist.

9      45.    Acara represented to plaintiff that plaintiff's performance appraisal would
10 be used to determine if plaintiff demonstrated the competencies to perform his job at
11 the next higher level of the career-ladder. Acara also represented to plaintiff that the
12 individuals serving as his first-line manager would indicate on his annual performance
13 appraisal if plaintiff did not demonstrate the competencies to perform his job at the
14 next higher lever of the career-ladder. Acara further represented to plaintiff that
15 plaintiff's performance appraisal would not be excluded in the determination of
16 whether plaintiff demonstrated the competencies to perform his job at the next higher
17 level of the career-ladder.

18     46.    Acara further represented to plaintiff that extraneous matters outside
19 plaintiff's annual performance appraisal would not be used to deny a career-ladder
20 promotion. This particular representation was important to plaintiff because none of
21 plaintiff's OPM annual performance appraisals contained critical managerial
22 comments, or otherwise indicated that plaintiff did not have the competencies to
23 perform his position at the next higher level of the career-ladder. For example,
24 plaintiff's OPM FY14 performance appraisal makes no mention a telephone
25 conversation Parman is alleged to have had with one of defendant's disgruntled clients.
26 Moreover, plaintiff's OPM FY14 performance appraisal does not reflect negative or
27 critical comments by Parman, Ryan, Knowles or any of the other individuals who
28 served as plaintiff's acting manager that fiscal year. Nevertheless, Parman used those
29 extraneous matters outside plaintiff's performance evaluation to justify his refusal to
30 promote plaintiff to the GS-13 level of the position.

47.     Acara also represented to plaintiff that in addition to a non-competitive career-ladder promotion based on plaintiff's meeting the statutory and OPM HR Handbook criteria, plaintiff was entitled to a within-grade pay increase provided his job performance was at the "*Fully Successful*" level.

## PLAINTIFF'S PROMOTION READINESS

### Annual Performance Evaluations

48.     Plaintiff received an "*Exceeds Fully Successful*" annual performance evaluation for OPM fiscal year 2011. According to the OPM handbook in effect at the time, an "*Exceeds Fully Successful*" performance evaluation means that the quality of plaintiff's work was outstanding and exceeded the requirements of the target GS-13 level of his career ladder position. This rating fairly characterized the longitudinal quality of plaintiff's work.

49.     Plaintiff received a "*Fully Successful*" annual performance evaluation for OPM fiscal year 2012. According to the OPM handbook in effect at the time, a "*Fully Successful*" performance evaluation means that the quality of plaintiff's work fully met the requirements of the target GS-13 level of his career ladder position.

50.     Plaintiff received a "*Fully Successful*" annual performance evaluation for OPM fiscal year 2013. According to the OPM handbook in effect at the time, a "*Fully Successful*" performance evaluation means that the quality of plaintiff's work fully met the requirements of the target GS-13 level of his career ladder position.

51.     Plaintiff received a "*Fully Successful*" annual performance evaluation for OPM fiscal year 2014 ("FY14"). According to the OPM handbook in effect at the time, a "*Fully Successful*" performance evaluation means that the quality of plaintiff's work fully met the requirements of the target GS-13 level of his career ladder position.  In that OPM FY14 appraisal, decision-maker Parman further indicated that plaintiff's performance:

> "...[d]emonstrates growth in the position by accepting
> and successfully accomplishing new assignments
> requiring greater skill..."

///
///

Administrative Law Judge Panel

52.     During OPM FY14, plaintiff served on a panel for the selection of administrative law judges. Based on information and belief, by statute, OPM has a non-delegable duty to administer the Administrative Law Judge examination, through which agencies make competitive service appointments of administrative judges. The Administrative Law Judge Program Office ("ALJPO") was established to carry out the agency's responsibility for planning, operating and directing the recruitment, examination and employment of AJs. ALJPO also provides approval of agency requests for AJ personnel actions and the utilization of ALJs. Specifically, the ALJPO acts on requests for all ALJ non-competitive actions, requests for inter-agency details and assignments to non-ALJ duties, requests for increases in pay based on superior qualifications, classification issues, and administration of the AJ priority referral program. Plaintiff's appointment to this panel is based on his being a high-level GS-12 HR Specialist in OPM FY14.

Training on Demand Instructor (HRToD)

53.     During OPM FY14, plaintiff was selected by defendant to serve as an Instructor of its HR Training on Demand Program (HRToD). HRToD is a fiscal procurement training program that charges a fee to high level classification employees, including Senior Executive Service ("SES") level employees who serve in the executive management of federal agencies.

54.     On June 10-12, 2014, plaintiff served as one of the instructors of defendant's HRToD program, a 3-day classification refresher training course offered to federal sector employees at a Denver Colorado location. In the course description, a true and correct copy of which is attached hereto as **Exhibit E**, defendant represented to its paying attendees, that:

> "...[a] federal classification expert will discuss current topics in basic and advanced classification (e.g., the Factor Evaluation Standard and narrative standard formats, defensible evaluation statements, statements of difference, and classifying developmental and supervisory positions). The instructor will review commonly appealed classification decisions, discuss

position management issues, and provide an update from OPM's Classification Policy Section..."

## **ACTING MANAGERS**

55.     During OPM fiscal year 2013, plaintiff's first-line supervisor, Michelle Acara, began taking an extended leave of absence, and was generally unavailable to evaluate the quality of plaintiff's work on a day-to-day basis.

Michelle Acara

56.     Although she did not execute an EEO affidavit in this case, Acara stated under oath in OPM EEO Case No. 2015014, that Acara was unavailable to evaluate the plaintiff's job performance as his first-line supervisor during the period from October 2012 to May 2013. In OPM EEO Case No. 2015014, Acara also stated under oath that she was unavailable to perform as plaintiff's first-line supervisor during the period from June 2013 to September 2013 while Acara was out on medical leave.

57.     OPM fiscal year 2013 ended September 30, 2013. Because of Acara's unavailability at the end of OPM fiscal year 2013, there was an ongoing vacancy of the first-line supervisor position for plaintiff in the ODPC unit.

58.     OPM FY14 began on October 1, 2013. Based on workplace observations as well as a statement Acara made under oath in OPM EEO Case No. 2015014, Acara was also unavailable to perform as plaintiff's first-line supervisor during the month of October 2013.

59.     Because of Acara's continuing unavailability during OPM FY14, Parman began making arrangements to have a series of acting managers serve as plaintiff's first-line supervisor until that position could be permanently filled.

60.     At the beginning of OPM FY14, plaintiff began to inquire how he could be fairly evaluated for a career-ladder promotion in the absence of Acara, the person who was most familiar with the longitudinal quality of his work.  At that time, plaintiff had a conversation with Parman about developing a roadmap for achieving a career-ladder promotion in the absence of his immediate first-line supervisor, Michelle Acara. In response, Parman represented to plaintiff that Parman would evaluate plaintiff at the mid-year and at the end of OPM FY14, soliciting the input of all acting managers to determine plaintiff's career-ladder promotion readiness.

61.     Early in OPM FY14, Parman appointed several GS-13 HR Specialists and a GS-13 Management Analyst to serve as plaintiff's acting manager. The purpose and scope of Parman's acting manager assignments are not clear, however, plaintiff is informed and believes that no acting manager had the authority to either promote plaintiff or recommend plaintiff for promotion during OPM FY14.

Acting Manager Yvonne Ryan

62.     In OPM EEO Case No. 2015014, Ryan indicated that she served as plaintiff's acting manager for only 60 days in 2014, not the 90-day period alleged in the affidavit Ryan submitted to the EEO specialist in this case on October 5, 2015. Moreover, according to her sworn testimony under oath at the administrative hearing in this case, Ryan stated that she served as plaintiff's acting manager in 2014, however, it was a period that fell during the non-relevant evaluation period of OPM fiscal year 2013.

Acting Manager Firooz Basri

63.     Basri served as plaintiff's acting manager during the relevant periods of January to February 2014, and from September to October 2014. According to Parman, Basri, a GS-13 Management Analyst, rated the plaintiff's performance at the OPM FY14 mid-year as "*Exceeds Fully Successful*".  Parman then alleged that despite rating plaintiff's performance as "*Exceeds Fully Successful*" at the OPM FY14 mid-year, Basri opined that plaintiff was not promotion ready. Parman further indicated that Basri rated the plaintiff's performance as "*Exceeds Fully Successful*" at the end of OPM FY14. Contrary to the representations made by Parman about asking Basri if plaintiff was promotion ready during OPM FY14, according to the affidavit Basri submitted to the EEO specialist in this case on September 30, 2015, Basri had no say in considering plaintiff for a promotion. Based on information and belief, Parman never asked Basri if plaintiff was promotion ready in OPM FY14.

Acting Manager Morris Blakely

64.     Blakely served as plaintiff's acting manager during the relevant period of February to April 2014. Parman never asked Blakely during OPM FY14 if plaintiff was promotion ready. In fact, Blakely believed that during OPM FY14, the quality of

plaintiff's work was at the full GS-13 performance level of the position. When asked a question about the reason plaintiff had not been promoted, in the affidavit he submitted to the EEO investigator in this case on September 21, 2015, Blakely stated that:

> "I don't know why Delton has not been promoted. I believe his skill level is equivalent (advanced to some) to other consultants with the same amount of experience and time on the Organizational Design and Position Classification (ODPC) team."

Acting Manager Rachelle Booth

65.     Booth served as plaintiff's acting manager during the relevant period of April to May 2014. Parman never asked Booth during OPM FY14 if plaintiff was promotion ready. Like Blakely, Booth also believed that during OPM FY14, the quality of plaintiff's work was at the full GS-13 performance level of the position. When asked her opinion about the reason plaintiff had not been promoted, in the affidavit she submitted to the EEO specialist on October 6, 2015, Booth stated:

> "Based on my observations...[plaintiff]...should have been promoted a long time ago."

Acting Manager Laura Knowles

66.     Based on information and belief, Laura Knowles was hired by OPM in approximately December 2009 in a career ladder GS-9/11/12/13 position as HR Specialist, and was assigned to a unit known as "Products and Services". Based on information and belief, after a 2010 organizational restructure, Knowles was assigned to the OPM HR Strategy/Workforce and Succession Planning unit. Based on information and belief, while serving in the OPM Strategy/Workforce and Succession Planning unit, Knowles did not perform significant duties that involved organizational design or position classification. Moreover, based on information and belief, while in the OPM Strategy/Workforce and Succession Planning unit, Knowles did not serve as an acting manager or first-line supervisor.

67.     In a YouTube® video posted by Parman on May 13, 2014, Parman introduced Knowles as part of OPM's Workforce and Succession Planning unit located

1  at its Kansas City, Missouri facility. A direct link to that YouTube® video is:
2  https://www.youtube.com/watch?v=8AskttwVPTI.
3      68.    Based on information and belief, sometime after May 13, 2014, Parman
4  gave Laura Knowles a temporary 120-day promotion to serve as plaintiff's acting
5  manager. Knowles served as plaintiff's acting manager during the relevant period of
6  May to September 2014. Despite her lack of experience in organizational design and
7  position classification, Knowles played a pivotal role in the defendant's decision to not
8  promote plaintiff to the full GS-13 performance level of his position in OPM FY14.
9  Moreover, Knowles' 120-day appointment as first-line supervisor had a negative impact
10 on the morale of the more qualified and technically competent African-American GS-13
11 ODPC HR Specialists. Knowles' temporary 120-day appointment gave her the
12 credentials, without ever having performed the duties of an OPM ODPC HR Specialist,
13 to be considered for the permanent first-line supervisor position of that unit.
14     69.    During the time Knowles performed as plaintiff's acting manager from
15 May through September 2014, Knowles did not perform any technical duties related to
16 organizational design or position classification. During the time Knowles performed as
17 plaintiff's acting manager from May through September 2014, Knowles did not
18 personally manage an ODPC project involving organizational design or position
19 classification.
20     70.    According to the affidavit Basri submitted to the EEO investigator on
21 September 30, 2015, Basri served as plaintiff's acting manager during the month of
22 September 2014. Based on information and belief, Knowles' tenure as the ODPC acting
23 manager ended before September 30, 2014, which is the end of the OPM 2014 fiscal
24 year. Based on information and belief, after Knowles' 120-day tenure as the ODPC
25 acting manager ended in September 2014, Knowles returned to the OPM
26 Strategy/Workforce and Succession Planning unit where she performed no duties
27 related to organizational design or position classification.
28     71.    On or about November 16, 2014, Parman promoted Knowles to the
29 position of plaintiff's permanent first-line supervisor. Despite not having served as
30 plaintiff's acting manager for the entire month of September 2014, Knowles opined that

at the end of OPM FY14, plaintiff was performing at the *"Minimally Successful"* level, and that plaintiff was not promotion ready. Thus, Parman's decision to not promote plaintiff at the end of OPM FY14 was based, in part, on Knowles' opinion that at the end of OPM FY14, plaintiff was not promotion ready.

72.    Knowles' opinion of plaintiff's promotion readiness at the end of OPM FY14 was based, in part, on Knowles' purported opinion that plaintiff lacked the requisite knowledge, skills and abilities to perform his position at the full GS-13 performance level of the position. Based on information and belief, during the period she served as plaintiff's acting manager in OPM FY14, Knowles had not acquired enough knowledge or experience in organizational design, position classification, administrative judge selection process or HR Training on Demand to determine that plaintiff was performing his job at the *"Minimally Successful"* level.

73.    In another YouTube® video posted by Parman on March 30, 2015, Knowles was introduced as "the boss" of the OPM ODPC unit. Thus, less than one year after receiving a temporary 120-day promotion as plaintiff's acting manager, and without having to demonstrate the competencies necessary to perform plaintiff's position at the GS-13 level, Knowles was promoted to serve as plaintiff's permanent first-line supervisor. A direct link to that YouTube® video is: https://www.youtube.com/watch?v=Hk3-t3bOgKw.

74.    Based on information and belief, Parman made the decision to promote Knowles to the position of plaintiff's first-line supervisor, in part, because Parman was able to influence Knowles to continue wrongfully denying plaintiff's career-ladder promotion. To that end, in his EEO affidavit executed on July 20, 2015, Parman identified Knowles as one of the two individuals having personal knowledge that plaintiff allegedly did not have the competencies to succeed at the GS-13 grade of his career-ladder position; the other individual Parman identified is Ryan. Also, to that end, Knowles opined at the end of OPM FY14, that plaintiff's performance was *"Minimally Successful"* and that plaintiff was not promotion ready.

## PARMAN'S EVALUATION OF PLAINTIFF'S COMPETENCIES

75.    In response to the EEO specialist's inquiry about plaintiff's discrimination

claims, on July 20, 2015, OPM decision-maker Parman submitted an affidavit under penalty of perjury, in which he stated:

> "In our evaluation, Delton continues to meet two of the criteria for career ladder promotion – time in grade and at least fully successful performance in his current position. However, he does not meet the third critical requirement – demonstration of the knowledge, skills and abilities (referred hereafter as competencies) necessary to succeed at the next higher grade level; in this case, the full performance level of GS-201-13, HR Consultant. Career ladder promotion is not automatic, and this requirement to demonstrate the competencies to succeed at the next higher grade level is well-established legally and in precedent government-wide. I have attached documentation to this requirement."

76.     Despite the provisions of defendant's HR Handbook, Chapter 430, Subchapter 5, paragraph 5-5(a) which requires that the plaintiff's performance appraisal be used to determine the plaintiff's ability to perform at the next higher level of his career-ladder position, Parman used extrinsic facts and documents outside the plaintiff's performance appraisal to determine plaintiff's promotion readiness.

<u>NTEU Collective Bargaining Agreement</u>

77.     In support of his opinion that plaintiff did not have the competencies to *succeed* at the full GS-13 performance level of the position, on July 20, 2015 Parman submitted a document to the EEO specialist titled "NTEU Guidance on Career Ladder Promotions", a true and correct copy of which is attached hereto as **Exhibit A**.

78.     The document titled "NTEU Guidance on Career Ladder Promotions", a true and correct copy of which is attached hereto as **Exhibit A**, is an excerpt from a National Treasury Employees Union collective bargaining agreement that has never governed the terms of plaintiff's employment during his tenure as defendant's GS-0201-12/13 HR Specialist.

79.     During his sworn testimony under oath at the administrative hearing on August 19-21, 2019, Parman admitted that he obtained the document titled "NTEU Guidance on Career Ladder Promotions", attached hereto as **Exhibit A**, from an internet search, and that it is not an official OPM document. Parman lifted **Exhibit A**

from Article 15, Section 3 of the National Treasury Employees Union ("NTEU") Chapter 293 Collective Bargaining Agreement, which exclusively covers employees of the U.S. Securities and Exchange Commission. A link to that collective bargaining agreement and excerpt can be found at page 73 of the following internet address:

*https://www.secunion.org/sites/default/files/2013-CBA-6-Jan-14.pdf*

80.     The document titled "NTEU Guidance on Career Ladder Promotions" a true and correct copy of which is attached hereto as **Exhibit A**, contains career-ladder promotion criteria that differ from the criteria that officially govern plaintiff's OPM career-ladder promotion, as set forth at 5 C.F.R §335.104, and at Chapter 335, Subchapter 5, paragraph 5-5(a) of the OPM Human Resource Handbook ("HR Handbook").

81.     At no time during his employ by defendant as an OPM career-ladder GS-0201-12/13 HR Specialist was plaintiff a member of a collective bargaining unit.

82.     At no time during his employ by defendant as an OPM career-ladder GS-0201-12/13 HR Specialist was plaintiff a member of the National Treasury Employees Union.

83.     At no time during his employ by defendant as an OPM career-ladder GS-0201-12/13 HR Specialist were the terms of plaintiff's employment governed by a National Treasury Employees Union collective bargaining agreement. Although some of the career-ladder promotion criteria found in the NTEU collective bargaining agreement attached hereto as **Exhibit A** are similar to the career-ladder promotion criteria governing plaintiff as found at 5 C.F.R. §335.104 and in the HR Handbook, there are some very important distinctions.

NTEU: Inapposite Terms

84.     The excerpt from the NTEU collective bargaining agreement submitted by Parman to the EEO specialist on July 20, 2015, a true and correct copy of which is attached hereto as **Exhibit A**, states, in pertinent part, that:

> "An employee is eligible for career-ladder promotion
> provided all of the following conditions have been met:
> 1. the employee has demonstrated the ability to perform at
> the higher grade level duties;

2. the employee has completed at least one (1) year in the
current grade;
3. there is sufficient work at the higher grade at the
position;
4. sufficient funds are available, and
5. the employee's current written performance appraisal is
acceptable."

<u>Determination the Sufficient Work Exists at the Time of Hire</u>

85.     Unlike the criteria set forth for unionized employees governed by the
"NTEU Guidance of Career Ladder Promotions", attached hereto as **Exhibit A**, neither
5 C.F.R. §335.104, nor the OPM HR Handbook at Chapter 335, Subchapter 5 state that
an OPM employee is eligible for a career-ladder promotion provided sufficient work
exists at the higher grade of the position. To the contrary, the OPM HR Handbook states
at Chapter 335, Subchapter 1, paragraph 1-4(b), that:

"Career ladders are established for recruitment purposes
based on a classification decision that sufficient work
exists at the full performance level to support the grade."

86.     Based on the provisions of Chapter 335, Subchapter 1, paragraph 1-4(b) of
the OPM HR Handbook, a determination that sufficient work exists at the next higher
grade is made *at the time of hire* for the OPM career-ladder employee, not at the time
promotion is considered which is the case of a career-ladder employee covered by the
NTEU collective bargaining agreement.

87.     Based on the provisions of Chapter 335, Subchapter 1, paragraph 1-4(b) of
the OPM HR Handbook, a determination that sufficient funds are available to support a
promotion to the next higher grade of an OPM employee career-ladder is made *at the
time of hire*, not at the time a career-ladder promotion is considered as is the case for a
career-ladder NTEU employee.

<u>NTEU: Acceptable Performance Appraisal</u>

88.     There are no express terms at 5 C.F.R. §335.104, or in Chapter 335,
Subchapter 1, paragraph 1-4(b) of the OPM HR Handbook, that a state an OPM
employee is eligible for a career-ladder promotion provided that the employee's written
performance appraisal is "*acceptable*". Although the NTEU collective bargaining

agreement, attached hereto as **Exhibit A**, uses the criterion *"acceptable"* as a performance appraisal measure to determine career-ladder promotion eligibility for NTEU unionized employees, OPM uses different criteria such as *"Outstanding"*, *"Exceeds Fully Successful"*, *"Fully Successful"*, *"Minimally Successful"*, and *"Unacceptable"* as performance appraisal measures to determine OPM career-ladder promotion eligibility.

NTEU: Demonstrate Ability to Succeed

89.     Parman's use of the criterion *"succeed"* with respect to plaintiff's eligibility for a career-ladder promotion is inapposite. The criterion *"succeed"* does not appear in the excerpt Parman lifted from Article 15, Section 3 of the National Treasury Employees Union ("NTEU") Chapter 293 Collective Bargaining Agreement, a true and correct copy of which is attached hereto as **Exhibit A**. In fact, according to the OPM HR Handbook, the appropriate criterion with respect to plaintiff's competencies and career-ladder promotion readiness is an evaluation of plaintiff's ability to *"perform"* at the next higher grade.

Parman's Commitment to Plaintiff

90.     In his EEO Affidavit, in response to a question about whether plaintiff expressed an interest in being promoted at the beginning of OPM FY14, Parman stated under penalty of perjury, that:

> "Yes, Delton personally requested a promotion to me at the beginning of FY14. I committed to him that I would solicit feedback from everyone who served as his acting supervisor for the first six months of the fiscal year (we had a vacancy in the first-line supervisor position and filled it through a number of acting assignments.) I committed to him that I would evaluate all the feedback from his acting managers, would determine whether to promote him at midyear, and would discuss my findings with him. At midyear I solicited performance feedback from each of his acting managers, and specifically included the question as to whether Delton was ready to be promoted to the full performance level of the position (i.e., had he demonstrated the competencies required to succeed as a project manager and senior consultant.) Every acting manager (comprised of current GS-13s in his organization; male and female; black, white and Iranian; over and under 40) stated that Delton was not ready

to be promoted, as he had not demonstrated the competencies necessary toto succeed at the GS-13 level. I accepted their unanimous input in making my decision not to promote Delton, as these staff had all knowledge of Delton's performance and capability, having worked closely with him on projects. I communicated this decision to Delton, who disagreed with my (and his two previous managers', and all of his seven acting managers') assessment of his performance and capabilities."

### Parman's False Allegation Re: Acting Managers

91.　　In support of the contentions set forth in his EEO Affidavit executed under oath on July 20, 2015 that all acting managers unanimously agreed that plaintiff was not promotion ready in OPM FY14, Parman submitted a spreadsheet to the EEO investigator, a true and correct copy of which is attached hereto as **Exhibit B**. The spreadsheet attached hereto as **Exhibit B**, falsely represents that all of plaintiff's acting managers serving in OPM FY14 unanimously agreed that plaintiff was not promotion ready. Acting managers Blakely and Booth each opined that plaintiff was promotion ready in OPM FY14, and each stated under oath that Parman never asked them if plaintiff was promotion ready in OPM FY14. Thus, when Parman submitted the spreadsheet attached hereto as **Exhibit B** to the EEO specialist on July 20, 2015, Parman knew that all of plaintiff's acting managers during OPM FY14 did not opine that plaintiff was not promotion ready.

### Parman's Spreadsheet

92.　　Parman's spreadsheet, a true and correct copy of which is attached hereto as **Exhibit B**, falsely represents that Blakely rated plaintiff's mid-year job performance as "*Minimally Successful*". In the affidavit he submitted to the EEO specialist in this case on September 21, 2015, Blakely stated that plaintiff was performing work at the full GS-13 performance level of the position.

93.　　Parman's spreadsheet, a true and correct copy of which is attached hereto as **Exhibit B**, also falsely represents that Blakely opined that plaintiff was not promotion ready at the mid-year of OPM FY14. Blakely specifically stated under oath at the administrative hearing that Parman never asked Blakely about plaintiff's

1   competencies, knowledge, skills or abilities that Blakely observed while serving as
2   plaintiff's acting manager in OPM FY14.

3        94.   Parman's spreadsheet, a true and correct copy of which is attached hereto
4   as **Exhibit B**, also falsely represents that that Acara rated plaintiff's OPM FY14 mid-
5   year job performance as "*Minimally Successful*" while opining that plaintiff was not
6   promotion ready. According to a statement made by Acara under oath in a EEOC Case
7   Number 550-2015-00343X, Acara was unavailable to rate the plaintiff's OPM FY14 mid-
8   year job performance because Acara was on medical leave during that time.

9        95.   Parman's spreadsheet, a true and correct copy of which is attached hereto
10  as **Exhibit B**, falsely represents that Booth, who rated plaintiff's OPM FY14 mid-year
11  job performance as "*Fully Successful*", opined that plaintiff was not promotion ready at
12  the mid-year OPM FY. Contrary to the representation made in Parman's spreadsheet,
13  Booth was never asked by Parman if plaintiff was promotion ready in OPM FY14, and
14  Booth never told Parman that plaintiff was not promotion ready in OPM FY14. Booth
15  specifically stated under oath at the administrative hearing that Parman never asked
16  Booth about plaintiff's competencies that Booth observed while serving as plaintiff's
17  acting manager in OPM FY14. Moreover, Booth attached a document to the EEO
18  affidavit she submitted to the EEO specialist on October 6, 2015. The document Booth
19  attached to her EEO affidavit, a true and correct copy of which is attached hereto as
20  **Exhibit D**, contains a series of emails from Parman to the ODPC team, and from Booth
21  to Parman. Those emails, attached hereto as **Exhibit D**, clearly and unequivocally show
22  that Parman did not ask *any* of the individuals who served as plaintiff's acting manager
23  in OPM FY14 if plaintiff was qualified for a promotion to the full GS-13 performance
24  level of his position.

25       96.   Parman's spreadsheet, a true and correct copy of which is attached hereto
26  as **Exhibit B**, falsely represents that Firooz Basri, who rated plaintiff's mid-year job
27  performance as "*Exceeds Fully Successful*", opined that plaintiff was not promotion
28  ready. An "*Exceeds Fully Successful*" performance evaluation, according to the OPM HR
29  Handbook, means that the quality of plaintiff's work was outstanding, and exceeded the
30  requirements of the target GS-13 level of his career ladder position. Based on

information and belief, Parman never asked Basri if plaintiff was promotion ready at the OPM FY14 mid-year. Based on the emails between Parman, Booth and the other acting managers in OPM FY14, a true and correct copy of which is attached hereto as **Exhibit D**, Parman did not ask any of the individuals serving as plaintiff's acting manager in OPM FY14 if plaintiff was promotion ready.

97.     Parman's spreadsheet, attached hereto as **Exhibit B**, falsely represents that Yvonne Ryan, who rated plaintiff's OPM FY14 mid-year job performance as "*Fully Successful*", opined that plaintiff was not promotion ready. Ryan stated under oath at the administrative hearing on August 19-21, 2019, that Ryan served a plaintiff's acting manager during OPM fiscal year 2013. Based on information and belief that Ryan served as plaintiff's acting manager during OPM FY13, Parman did not ask Ryan if plaintiff was promotion ready in OPM FY14.  Moreover, in her EEO Affidavit executed under oath on October 5, 2015, Ryan stated that:

> "...I am not in any authority to state exactly what is
> needed for the...[plaintiff]...to be promoted or not
> promoted...."

Based on information and belief, Parman did not ask Ryan if plaintiff was promotion ready in OPM FY14.

98.     Parman's spreadsheet, a true and correct copy of which is attached hereto as **Exhibit B**, falsely represents that in Laura Knowles acted in good faith when she rated plaintiff's OPM FY14 year-end job performance as "*Minimally Successful*". Parman's spreadsheet, attached hereto as **Exhibit B**, also falsely represents that in good faith Laura Knowles opined that plaintiff was not promotion ready. During her tenure as plaintiff's acting manager during OPM FY14, Knowles had no significance experience in organizational design or position classification. At one point during OPM FY14, Knowles burst into tears when confronted by plaintiff with the reality that Knowles was too inexperienced to rate the plaintiff's job performance, or assist plaintiff in obtaining a career-ladder promotion in his position.

## PARMAN WITNESS TAMPERING

99.     On June 18, 2018, in anticipation of the administrative hearing, Jason Parman dispatched an email to the plaintiff's designated witnesses, Blakely and Booth, a

true and correct copy of which is attached hereto as **Exhibit F**. Along with the email attached hereto as **Exhibit F**, Parman attached the confidential declaration he submitted to the EEO investigator on July 20, 2015, thereby attempted to corruptly influence the testimony of plaintiff's designated witnesses.

100.    In Parman's June 18, 2018 group email attached hereto as **Exhibit F**, Parman made an unauthorized disclosure to the recipients of confidential communications made by plaintiff during the ADR process. Parman admitted under oath at the administrative hearing that Parman had been advised that all communications made during the ADR process were confidential.

101.    In Parman's June 18, 2018 group email attached hereto as **Exhibit F**, Parman attempted to persuade Blakely, Booth and Ryan to testify at the administrative hearing that each was asked by Parman whether plaintiff was promotion ready at the OPM FY14 mid-year, and that each opined in the negative. At the time Parman dispatched the group email on June 18, 2018 attached hereto as **Exhibit F**, Parman knew that he had not asked Blakely, Booth or Ryan if plaintiff was promotion ready at the OPM FY14 mid-year. At the time Parman dispatched the group email on June 18, 2018 attached hereto as **Exhibit F**, Parman knew that neither Blakely, Booth nor Ryan opined that plaintiff was not promotion ready at the mid-year of OPM FY14.

102.    Based on information and belief, Parman did not ask any of plaintiff's acting managers if plaintiff was promotion ready during OPM FY14 because Parman had no genuine intent to promote plaintiff.

## WORKFORCE PROFILE

103.    Parman's discriminatory policies and practices resulted in an OPM workforce in which African-American employees were intentionally underrepresented and intentionally denied career-ladder promotions. Based on information and belief, during OPM FY14, defendants employed approximately 33 full-time HR Specialists in its ODPC unit, of whom approximately 10 employees were hired in career-ladder developmental positions like plaintiff.

104.    Based on information and belief, defendant's ODPC workforce profile in OPM FY14 consisted of 33 employees, of whom 24 identified themselves as Caucasian, 8

identified themselves as Black or African-American, and 1 of whom identified himself as Asian. In addition, of defendant's 33 ODPC employees in OPM FY14, only 2 employees were age 60 or older. Based on representations made by Parman, plaintiff is informed and believes that in OPM FY14, Parman engaged in an intentional campaign of hiring non-class similarly situated personnel from outside OPM in order to reduce the workplace diversity.

105.   Rachelle Booth, who was appointed by Parman as one of plaintiff's acting managers in OPM FY14, submitted an affidavit in which she stated under oath a comment made by Parman with respect to his intent to create a homogenous workforce.  Booth stated "...Jason Parman has articulated in the past that he has gone to his old college to hire employees because, '...*they have the same values as me...they are all alike*'". This statement was understood by Booth to mean that Parman does not encourage diversity, and that Parman is only interested in hiring and promoting Caucasian employees.

106.   In FY 2014, defendant's workforce profile was substantially as follows:

| Grade | Number of Employees | Description | Age | Race |
|-------|---------------------|-------------|-----|------|
| GS-15 | 1 | HR Strategy Group Manager (Jason Parman) | Under 40 | Caucasian |
| GS-14 | 3 | Supervisory HR Specialists | Under 40 | Caucasian |
| GS-13 | 23 | HR Specialists and 1 HR Management Analyst | Under 40 | 1 Asian 3 Black 20 Caucasian |
| GS-12 | 3 | HR Specialists (includes Plaintiff) | Plaintiff over 40 | Black |
| GS-09 | 1 | HR Assistant | Under 40 | Caucasian |
| GS-07 | 2 | Administrative Assistants | Under 40 | Caucasian |

107.   From OPM fiscal year 2010 through fiscal year 2014, OPM's upper management was comprised almost exclusively of white employees. The homogenous racial composition of OPM's management is intentional.

108.   Based on information and belief, Mr. Parman communicated these

1  discriminatory policies and practices in explicit terms to lower-level managers, such as
2  Michelle Acara and Laura Knowles, the latter two of whom made personnel decisions
3  adversely affecting plaintiff during OPM FY14.

4  ## PREFERENTIAL TREATMENT OF NON-CLASS EMPLOYEES
5  ### Retired Annuitants

6  109.    As a result of Parman's discriminatory policies and practices, a similarly
7  situated employee outside of plaintiff's protected class, Jason Hohman, who had less
8  experience and technical ability than several African-American ODPC GS-12/13 HR
9  Specialists during OPM fiscal year 2013, was given retired annuitants to assist with the
10 management of his projects. Hohman is a similarly situated employee because he and
11 plaintiff worked in the same ODPC unit, were assigned essentially the same tasks, were
12 working under the same first-line and second-line supervisors, and were both GS-0201-
13 12/13 career-ladder HR Specialists.

14 110.    Hohman was credited by Parman for work Hohman performed on projects
15 in which Hohman had retired annuitants assist Hohman in completing the volume,
16 complexity and timeliness of his projects.  Parman subsequently gave Hohman a
17 noncompetitive promotion to the full GS-13 level of his career-ladder position based on
18 the assistance Hohman received from retired annuitants. Similarly situated African-
19 American career-ladder GS-12/13 HR Specialists were not given retired annuitants to
20 assist with their projects.  Plaintiff, in particular, was never assigned retired annuitants
21 to assist with his projects. To the extent Parman assigned retired annuitants to assist the
22 productivity of Hohman, but did not assign retired annuitants to assist plaintiff, Parman
23 gave preferential treatment to a similarly situated employee who is not in plaintiff's
24 protected class.

25 ### Assignment of High-Value Projects

26 111.    The assignment of high value projects was a tactic lower-level managers
27 and first-line supervisors were able to use in the unfair treatment of African-American
28 employees while justifying the promotion of similarly situated career-ladder employees
29 who were not in plaintiff's protected class.  In the ODPC unit, African-American
30 employees were routinely excluded from managing high value projects of $300,000 or

more, and were thereby precluded from consideration for a career-ladder promotion based on that uncodified prerequisite. In this manner, by intentionally assigning high value projects to similarly situated employees who were not in plaintiff's protected class, those non-class member similarly situated employees were given preferential treatment.

<u>Temporary 120-Day Promotion</u>

112. Parman promoted Knowles to the first-line supervisor position of the ODPC unit, despite Knowles' utter lack of knowledge or experience in organizational design or position classification. Parman used the temporary 120-day promotion as a tactic to catapult Knowles, an inexperienced employee who is not a member of plaintiff's protected class, into the position of a first-line supervisor over several more highly qualified African-American GS-13 HR Specialists. Use of the temporary 120-day promotion was just one example of how Parman gave preferential treatment to a similarly situated employee who is not in plaintiff's protected class. Based on information and belief, Knowles is currently a GS-15 level employee.

<u>Bypass of the One-Year Service Rule</u>

113. There were additional unwritten criteria imposed on plaintiff by Parman as a prerequisite to a career-ladder promotion, that were not imposed on similarly situated employees who are not in plaintiff's protected class. One such additional criterion imposed by Parman is that plaintiff was required to perform at the "*Fully Successful*" level for 52 weeks in his position before being considered for a noncompetitive career-ladder promotion.

114. In furtherance of his discriminatory policies and practices, Parman took advantage of the absence of Michelle Acara to give a career-ladder promotion to a similarly situated GS-0201-12/13 employee Hohman, the latter of whom is not in plaintiff's protected class. In his Justification for the promotion of Hohman during Acara's absence on June 16, 2013, as memorialized in **Exhibit C** attached hereto, Parman stated that Hohman "...has been on the ODPC team for just under a year...". To the extent Parman required plaintiff to serve in his position for at least one year with a "*Fully Successful*" performance rating before qualifying for consideration of a career-ladder promotion, but did not impose that requirement on Hohman, Parman gave

preferential treatment to a similarly situated employee who is not in plaintiff's protected class.

### Credit for Outside Agency Experience

115.   In his promotion justification of Hohman during the absence Hohman's first-line supervisor, Michelle Acara, Parman credited Hohman with work Hohman performed at *two* prior agencies, including the United States Army Corps of Engineers. Based on information and belief, Parman

116.   To the extent Parman did not credit plaintiff for work plaintiff performed at an outside agency with respect to plaintiff's career-ladder promotion readiness, Parman gave preferential treatment to a similarly situated employee who is not in plaintiff's protected class.

### Promotion Package

117.   Another additional criterion imposed on plaintiff that was not imposed on a similarly situated employee who is not in plaintiff's protected class is that plaintiff's immediate supervisor must first put together a promotion justification package before plaintiff could be considered for a noncompetitive career-ladder promotion. Plaintiff is informed and believes that two similarly situated employees who are not in plaintiff's protected class, Jason Hohman and Yvonne Ryan, were each given a career-ladder promotion without having a promotion package submitted by a first-line supervisor.

118.   Ryan, a similarly situated employee who is not in plaintiff's protected class, stated under oath that because she was performing at the *"Fully Successful"* level, Ryan was given an automatic career-ladder promotion in her position as a GS-0201-12/13 HR Specialist without a first-line supervisor having to submit a promotion package on her behalf.

119.   Hohman, a similarly situated employee who is not in plaintiff's protected class, was promoted by a second-line supervisor in his career ladder position as GS-0201-12/13 HR Specialist. Based on information and belief, at no time in OPM fiscal year 2013 did Parman serve as the first-line supervisor of OPM's ODPC unit. According to her affidavit submitted to the EEO investigator in OPM EEO Case No. 2015014, Acara was unavailable to serve as plaintiff or Hohman's first line supervisor from October 2012

through September 2013. Based on the foregoing information and belief, Acara was unavailable to assess Hohman's performance on a day-to-day basis from October 2012 through June 16, 2013, the date on which Parman promoted Hohman. Based on information and belief, Parman did not have sufficient input from Hohman's first-line supervisor to justify the promotion.

## UNCERTAINTY AS TO PERFORMANCE EVALUATION
## AND PROMOTION CRITERIA

120. When Parman recruited plaintiff into OPM's ODPC unit in 2010, plaintiff was never given a formal written job description or a manual containing OPM policy or procedure with respect to the discretion involved in the evaluation of his job performance. Specifically, at the time of his 2010 hire into the ODPC unit, plaintiff was not given OPM written standards with respect to:

A. Specific measures or guidelines that would be used to determine the quality or timeliness of plaintiff's work product or project submissions;

B. An indication of whether customer complaints or feedback from project managers would negatively impact plaintiff's performance appraisal;

C. Whether plaintiff would have an opportunity to inspect or challenge any negative feedback from ODPC clients or program managers with respect to plaintiff's performance appraisal;

D. The number, nature or fiscal value of projects that plaintiff would be expected to manage during a fiscal year in order to be considered performing at the "*Fully Successful*" level;

E. Whether a minimum fiscal value of a project managed by plaintiff is a prerequisite for a promotion to the next higher grade level of his position.

F. Whether retired annuitants could be assigned to assist employees on open projects;

G. The criteria used by first-line supervisors to determine if a high value assignment would be given to plaintiff to manage.

121.    Blakely stated that the criteria in the ODPC for career-ladder promotion is "...*a moving target...*", and that Parman has not established a clear written policy with respect to plaintiff's career-ladder promotion. Blakely also stated that Parman imposed an additional unwritten promotion criterion that plaintiff manage a project of a certain dollar value in order to qualify for a career-ladder promotion. Parman did not impose a requirement on that Hohman must manage a major project to be qualified for a career-ladder promotion. In fact, in Parman's justification for the career-ladder promotion of Hohman, Parman stated that although:

> "...Jay has not yet had the opportunity to independently manage a major ODPC project in the past year, he has extensive previous experience independently managing projects with his *two prior agencies...*" (emphasis added)

122.    To the extent Parman required plaintiff to independently manage a major project to be considered for a career-ladder promotion, but did not impose that same requirement on Hohman, Parman gave preferential treatment to a similarly situated employee who is not in plaintiff's protected class.

123.    Parman imposed yet another additional unwritten career-ladder promotion criterion that plaintiff must earn a Master of Business Administration ("M.B.A.") graduate degree to qualify for a career-ladder promotion. To the extent Parman required plaintiff to earn an M.B.A. to be considered for a career-ladder promotion, but did not impose that requirement on Hohman or Ryan, Parman gave preferential treatment to an employee who is not in plaintiff's protected class.

**RETALIATION**

124.    Plaintiff engaged in protected activity during the months of May through September of OPM FY14 by informally questioning the propriety of the promotions of similarly situated employees Laura Knowles, Jason Hohman and Yvonne Ryan, the latter three of whom are not in plaintiff's protected class. At one point, plaintiff and a similarly situated African-American HR Specialists, Douglas E. Robinson, openly questioned Laura Knowles' ability to provide career development because of her utter lack of expertise in the areas of organizational design and position classification. In

response, Knowles left the room in tears. Shortly thereafter, Parman responded that he has the power and discretion to place whomever he wants wherever he wants in the Agency. Plaintiff understood this as a veiled threat to either terminate plaintiff or continue refusing to promote if plaintiff continued to engage in protected activity by questioning the promotions of similarly situated employees who are not in plaintiff's protected class.

125.    Plaintiff was subjected to adverse employment action *after* engaging in protected activity which included, *inter alia*: (a) failure to receive career development, (b) refusal to appoint a technically competent permanent supervisor who could accurately assess plaintiff work, (c) divulging confidential information about the plaintiff for the purpose of causing bias with respect to the assessment of plaintiff's lack of promotion readiness, (d) influencing certain of the plaintiff's acting managers and plaintiff's former supervisor to submit a *"Minimally Successful"* performance evaluation for OPM FY14, (e) knowingly transmitting false documents and information to the EEOC through interstate commerce for the purpose of intentionally misrepresenting facts with respect to plaintiff's promotion readiness.

126.    There is a causal connection between plaintiff's protected activity and the adverse employment actions.

## COUNT I
### Title VII, 42 U.S.C. § 2000e-2(a)
[Race Discrimination (Disparate Treatment) in Violation of Title VII
of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2(a)]

127.    Plaintiff incorporates by reference, as if fully set forth herein, the allegations contained in paragraphs 1-126, hereinabove.

128.    Plaintiff is a member of a class of individuals protected under Title VII, based on his race as an African-American.

129.    Plaintiff was qualified for a career-ladder promotion during OPM FY14 based on the opinions of several qualified acting managers, plaintiff's position on an AJLPO panel, and on defendant's designation of plaintiff as a HRToD Instructor and "federal classification expert".

130.   Plaintiff was subject to adverse employment actions which included the defendant's failure to provide either career development or a career-ladder promotion in OPM FY14.   Parman's decision to not give plaintiff a non-competitive career-ladder promotion to the full GS-13 performance level of his position was made during the 45-day period of plaintiff's EEO complaint.

131.   Similarly situated individuals outside the plaintiff's protected class were given preferential or favorable treatment. That preferential treatment included, but was not limited to assigning those similarly situated non-class individuals high value assignments, retired annuitants and less stringent promotion requirements.

132.   As a direct, legal and proximate result of the discrimination, plaintiff has sustained economic and emotional injuries, resulting in damages in an amount to be proven at trial. Moreover, defendants' unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to plaintiff's right to be free from discrimination based on race.

133.   Plaintiff is entitled to his reasonable attorneys' fees and costs of suit.

## COUNT II
### Title VII, 42 U.S.C. § 2000e-2(a)
### Age Discrimination in Employment Act

134.   Plaintiff incorporates by reference, as if fully set forth herein, the allegations contained in paragraphs 1-133, hereinabove.

135.   Plaintiff exhausted administrative remedies by alleging age discrimination in the EEOC Complaint.

136.   Plaintiff was over the age of 40 years old during the entirety of OPM FY14.

137.   Plaintiff was qualified for a career ladder promotion to the GS-13 level in OPM FY14 for which a promotion was requested.

138.   Plaintiff was denied a requested career ladder promotion in OPM FY14.

139.   The decision to promote a similarly situated and substantially younger individual to the position of GS-13 in OPM FY13 was made on or before September 30, 2014. The decision to promote Laura Knowles, a Caucasian female who was 30 years old at the time, to the position of plaintiff's permanent first-line supervisor was made during the 45-day period of plaintiff's EEO complaint.

140.   As a direct, legal and proximate result of this discrimination, plaintiff has sustained economic and emotional injuries, resulting in damages in an amount to be proven at trial.

141.   Plaintiff is entitled to his reasonable attorneys' fees and costs of suit.

## COUNT III
### Title VII, 42 U.S.C. § 2000e-2(a)
### Retaliation for Engaging in Protected Activity

142.   Plaintiff incorporates by reference, as if fully set forth herein, the allegations contained in paragraphs 1-141, hereinabove.

143.   Plaintiff engaged in protected activity during OPM FY14 when he complained about discrimination and harassment based on race. Plaintiff complained about similarly situated employees not in plaintiff's protected class being given preferential treatment, and about Parman's declaration of intent to specifically hire and promote employees outside of plaintiff's protected class.

144.   Defendant responded to plaintiff's protected activity by subjecting plaintiff to adverse employment action which included, but was not limited to, a refusal to promote, assigning retired annuitants to assist similarly situated employees outside plaintiff's protected class, and a refusal to provide career development.

145.   The retaliation endured by plaintiff would dissuade a reasonable employee from making complaints of discrimination and harassment. The Division Manager made it clear that he wanted the workplace to reflect his culture, race and values. To that end, Parman instilled fear and intimidation by abusing his power and promoting obviously unqualified supervisor in Laura Knowles.

146.   There is a direct link between the defendants acts of retaliation and the adverse employment action to which plaintiff was subjected by the defendant. Moreover, the legal and proximate result of the discrimination, Plaintiff-Intervenor has sustained economic and emotional injuries, resulting in damages in an amount to be proven at trial.

147.   Defendants' unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to plaintiff's right to be free from retaliation.

148.   Plaintiff is entitled to his reasonable attorneys' fees and costs of suit.

## PRAYER FOR RELIEF

WHEREFORE, the plaintiff prays that the Court grant the following relief:

1. For lost wages, penalties and all other compensation denied or lost to plaintiff by reason of defendants' unlawful actions, in an amount to be proven at trial;

2. For compensatory damages for plaintiff's emotional pain and suffering, in an amount to be proven at trial;

3. For interest on lost wages, compensation, and damages, including pre- and post-judgment interest and an upward adjustment for inflation;

4. For reasonable attorneys' fees and costs of suit pursuant to 42 U.S.C. § 2000e- 5(k), 42 U.S.C. §1988, and other laws; and

5. For such other and further relief as this court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure, and Section 102 of the Civil Rights Act of 1991, 42 U.S.C. §1981 (a).

## CERTIFICATION AND CLOSING

Pursuant to Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this first amended complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

///

///

///

1

## <u>VERIFICATION</u>

2

*I declare under penalty of perjury, under the laws of the State of*
*California, that the foregoing is true and correct, and that this declaration*

3

*was executed this 29ᵗʰ Day of April 2022, at San Antonio, Texas.*

4

5

Delton York,

6

Plaintiff

7

///

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29

30

# NTEU Guidance on Career Ladder Promotions

## Article 15: Career Ladder Promotions
### Section 1

While promotions within career-ladders are neither automatic nor mandatory, career advancement is the intent and expectation in the career-ladder system.

### Section 2

A. A career ladder is a series of positions of increasing difficulty in the same line of work through which an employee may progress from the entry level to the full performance level.

B. The full performance level is the highest grade level to which an employee may be promoted non-competitively within a career ladder.

### Section 3

A. An employee is eligible for a career-ladder promotion provided all of the following conditions have been met:

1. the employee has demonstrated the ability to perform the higher grade level duties;

2. the employee has completed at least one (1) year in the current grade;

3. there is sufficient work at the higher grade level position;

4. sufficient funds are available; and

5. the employee's current written performance appraisal is acceptable.

EXHIBIT _H, TAB l_

PAGE ___ OF ___

Exhibit

**A**

**ODPC MID-YEARS**
FY14

| | MORRIS | MICHELLE | RACHELLE |
|---|---|---|---|
| Arcara, Michelle | EFS | EFS | EFS |
| | EFS | | |
| Ryan, Yvonne M | EFS | O | EFS |
| | EFS | | EFS |
| Bash, Fred | EFS | O | EFS |
| Blakely, Morris A | EFS | O | EFS |
| Marts, Kevin A | MS | ES | ES |
| Pritchett, Jackie M | ES | EFS | ES |
| Hofman, Jason L | EFS | O | EFS |
| Lowax, Angella M | EFS | EFS | EFS |
| Robinson, Douglas E. | MS | MS | S |
| Robinson, Douglas E. - Prom? | No | No | No |
| York, Delton L | MS | MS | S |
| York, Delton L - Promotion Ready? | No | No | No |



EXHIBIT ___1+, TAB∂___
PAGE ___1___ OF ___2___

Exhibit
B

| FIROOZ | YVONNE | |
|--------|--------|------|
| O | O | EFS |
| O | FS | EFS |
| O | O | O |
| O | EFS | EFS |
| O | O | O |
| O | EFS | EFS |
| EFS | FS | FS |
| EFS | FS | FS |
| O | O | O |
| EFS | EFS | EFS |
| EFS | MS | MS |
| No | No | No |
| EFS | FS | FS |
| No | No | No |

EXHIBIT  H  TAD
PAGE  2 OF  2

### Full Performance Level Career Ladder Promotion Justification: Jason (Jay) Hohman

This requests the promotion of Jay Hohman, HR Strategy/ODPC, who is in a career ladder position with a full performance level of GS-13. Jay is currently a GS-0201-12/04. His promotion to the GS-0201-13, with the effective date of 06/16/2013, is hereby requested and justified below for performance above expectation on the following competencies required for the position.

## Technical Competency

*Technical Competency for Organizational Design and Position Management (ODPC):*
*Uses knowledge that is acquired through formal training or extensive on the job experience to perform one's job...*
Jay has considerable knowledge and expertise in org design and position classification policy and technical application. Jay came to us with extensive experience in Federal Classification and quickly became a go to asset for anything highly technical. Jay can easily answer client questions regarding classification standards, appeals decisions, policies, and procedures. He is sought out by other team members to review technical work and determine if application of standards has occurred properly. He has even been asked by team members to mentor and train them in the application of classification standards. While Jay has not yet had had the opportunity to independently manage a major ODPC project in the past year, he has extensive previous experience independently managing projects with his two prior agencies. In addition, he serves as the Assistant Project Manager for the VACO project, far and away ODPC's largest initiative. Jay provides substantive project management assistance, advising team members on project requirements, coaching and mentoring team members, assigning work and resources, reporting to the client, attending and presenting at regular and recurring meetings and acting as the Primary Project Manager for the account in the absence of Morris Blakely. In addition to VA, Jay has managed some of our smaller projects successfully and contributes to a majority of our other classification projects, often being personally requested by clients to work difficult classification actions. He's truly an expert classifier and a stellar project manager. **General Competencies**

*Problem Solving:*
*Ability to identify and analyze problems, use sound reasoning to arrive at conclusions, and find alternative solutions to complex problems.*
Jay is able to easily and independently identify problems, evaluate solutions, and recommend a course of action based on alternatives. Jay is sought out by team members to discuss potential solutions to issues, as well as to discuss potential problems that may arise and how to avoid these problems. Classification requires being able to solve a problem and make decisions as a basic part of the job. Jay is able to make tough classification decisions AND explain/defend them as needed with our clients and team members. While Jay has been on the ODPC team for just under a year, in that time he has been able to demonstrate sufficient skills in classification that would lend him to be considered one of the senior classifiers on the team. A large part of this is due to being able to take on any type of classification action and come to final conclusion on the title/series/grade of the position. Jay has also recently been given the "go ahead" to begin performing some QC work on the team, which is generally reserved for highly experienced GS-13 classifiers. Additionally, Jay came up with a very unique and promising solution to a resourcing issue that ODPC has been battling this FY. Due to Jay's experience working with the U.S. Army Corp of Engineers (USACE), Jay recommended the use of the USACE "Cadre" program that could potentially help us with our resource issues. After being personally tasked to run down the application of the program to determine fit,

EXHIBIT ___1__, TAB3
PAGE ___1__ OF _3_

Exhibit
C

Jay conducted all of the research on the USACE Reemployed Annuitant Cadre independently, meeting frequently with Senior Executives in DoD to ensure full understanding and application of the program. Jay has not only drafted all of the agreement documents to complete the process of obtaining / procuring services, but has shown initiative in solving some of the other issues that come along with the Cadre program to make it applicable to our unique needs. His ability to resolve issues has made this a promising solution to a potentially large resource issue for ODPC. Jay maintains a unique approach to solving his "problems" when applying classification standards. Jay works closely with our clients to "teach" them about the research he has conducted and the "why" of his research and determinations. Every client that Jay has worked with has found this technique valuable and it has improved our communications with many customers.

## Client Orientation:
*Ability to anticipate the needs of clients, achieve quality end products, and refine and improve services.*
Jay demonstrates exceptional customer service in his ability to communicate with the customer, assess needs, and satisfy expectations. He is always knowledgeable and responsive with his customers and potential clients. Jay anticipates customer needs. During this rating period, Jay has developed an excellent rapport with the POC for the FDA-CFSAN project, so much so that they're requesting his assistance by name and referring to him as our "expert classifier" on staff. Jay speaks to them about services provided, assurances of work etc, with the POC and continues to work well with her. Jay is also very cognizant of timelines in projects for customers expecting work returned to them and tries to stay within those time frames. Jay has spoken with several HR professionals in several different agencies about the services our team provides and how to contact us about work. Again, Jay also serves as Morris Blakely's "back-up" and as his assistant PM on the VACO contract. As such, he is in contact with the VA customers from time to time and represents OPM in an utmost professional capacity. Jay has gone TDY with Scott Andrus to aid in the delivery of client training on restructuring. Even though RIF is not one of his highly developed specialties, Jay was knowledgeable enough that he was able to be onsite with customers, participate in the training, and inject helpful thoughts and ideas into the training. Due to Jay's previous HR service background, Jay is extremely cognizant of our clients' needs and ready to help in any capacity. Jay is the utmost professional, returning calls promptly, ensuring he has a thorough understanding of the client problem, and subsequently ensuring the client has thorough understanding of his determinations.

## Oral Communication:
*Skill in oral communication to present findings and conclusions to agency personnel and management officials in a manner that stimulates positive results.*
Jay is confident and comfortable when providing trainings and presentations to agency personnel and senior managers. Jay has provided technical trainings (FEB Classification and RIF) and worked with managers one-on-one to communicate determinations and decisions. Jay actively participates in client and staff meetings verbally and communicates clearly and concisely. Jay has participated in over 10 higher level meetings with Senior Executives (VA, FDA, USACE, USAF) in which he was required to speak on behalf of ODPC as a technical expert and authority on the particular classification requirements of a job series. In every case, he was able to clearly communicate the issues on hand, as well as alternatives to resolve the issues, clearly and easily. Jay also participated in the HRSES Awareness Campaign in which he was part of a team of refiners that included participating in many teleconferences to help move that project along. Jay is well spoken, his communications are well prepared and well presented. He changes his tone and objective to meet the needs of his audience and does so professionally and with great tact.

## Written Communication

EXHIBIT H, TAB 3
PAGE 2 OF 3

2

*A high degree of writing proficiency to present findings and conclusions to agency personnel and management officials in order to stimulate needed program change.*

As a seasoned classifier, Jay is an effective writer. He composes clear, concise technical documents and reports, and on different projects, has been sought out to review project documents and provide feedback regarding content, grammar, and clarity.  Jay has developed several different types of written communication since he's been with the team.  Jay's conducted and documented full desk audits with full PD evaluations included.  He is also an effective communicator by email and IM, ensuring the tone and message are always appropriate. In fact, he is such a stellar writer that he has been asked to draft documents (templates) that will be utilized by the entire team and client agencies as well. As part of the VA project, Jay was required to develop and write standardized PD's that would be utilized by the entire team as the template for each series developed.

**Team Building:**
*Skill in orchestrating group processes, while encouraging and facilitating cooperation, pride, trust and group identity.*

Jay personifies the term "team player." He actively reaches out to other team members and can effectively lead teams. He contributes to discussions and brainstorming during staff meetings and project status meetings. Jay volunteers to pick up extra assignments when workload allows and passes along valuable information to the team. Jay has taken on more than his fair share of the ODPC workload, serving as the primary classifier on the VACO contract, FDA – CFSAN and OHR contracts, managing the USACE engagement, and always volunteering for internal HRSES projects.  When other consultants are in need, Jay is one of the first to offer his counsel and assistance.

_____ Approved          _____ Disapproved          _____ Discussion Required

_____          _____

Leslie J. Pollack, PhD          Date
Assistant Director, HRSES

EXHIBIT 14, TAB 3
PAGE 3 OF 3

3

**Jones, Kim C.**

| | |
|---|---|
| **From:** | Booth, Rachelle A. |
| **Sent:** | Thursday, August 27, 2015 10:40 AM |
| **To:** | Jones, Kim C. |
| **Subject:** | FW: Mid-year ratings - due COB Friday |

See below e-mail.

**From:** Booth, Rachelle A.
**Sent:** Friday, April 10, 2015 2:24 PM
**To:** Bottka-Smith, Elizabeth
**Subject:** FW: Mid-year ratings - due COB Friday

Here is the performance rating I sent to Jason.

**From:** Booth, Rachelle A.
**Sent:** Thursday, April 24, 2014 12:16 PM
**To:** Parman, Jason C.
**Subject:** RE: Mid-year ratings - due COB Friday

Jason,

These are my ratings.

| Employee | Mid-Year Rating | Possible ratings |
|---|---|---|
| Arcara, Michelle L | EFS | O |
| Andrus, L Scott | EFS | EFS |
| Ryan, Yvonne M | EFS | FS |
| Booth, Rachelle A | | MS |
| Basri, Firooz | EFS | U |
| Blakely, Morris A | EFS | |
| Marts, Kevin A. | FS | |
| Pritchett, Jacita M | FS | |
| Hohman, Jason L | EFS | |
| Lowe, Angelia M | EFS | |
| Robinson, Douglas E. | FS | |
| York, Delton L | FS | |

Rachelle Booth, Project Manager
HR Consultant, Org Design & Position Classification
Human Resources Solutions
U.S. Office of Personnel Management
(02) 553-1094
(209) 833-1835
Rachelle.Booth@opm.gov

**Exhibit**

**D**

EXHIBIT _M TAB 1_
PAGE _1_ OF _3_

1

**From:** Parman, Jason C.
**Sent:** Monday, April 21, 2014 3:39 PM
**To:** Arcara, Michelle L.; Ryan, Yvonne M.; Basri, Firooz; Blakely, Morris; Booth, Rachelle A.
**Subject:** Mid-year ratings - due COB Friday

Hi folks-

We've arrived at mid-year time and as you know, ODPC is in a bit of a unique situation this year. With our supervisory transition taking up much of this FY, we've had a lot of folks acting as the boss. I'll be giving the mid-years this time around, and the only way I know to do this is to solicit feedback from everybody who's been acting in ODPC for a substantial period of time (that would be you all.)

So, I need your help. Please fill out the chart below for every ODPC staff member, including yourself, and respond directly back to me (please don't "reply all," I don't want you influencing each other's ratings). I will take each of your ratings, aggregate them for each person (applying them proportionally based on how long you were acting), and come to a mid-year rating for each person I'll then communicate over the next two weeks.

I'm going to have Kelly begin setting up meetings for next week, so don't spend a lot of time on this (remember, your opinion is but a portion of the mid-year). Just put in your first-blush evaluation and I'll take it from there.

Also, let me just say thanks. The fact that all of you have served as the boss this year, coupled with our strong performance thus far, is a testament to your efforts and dedication. I really, really appreciate it. **So send me your ratings by COB Friday** and we'll be good to go.

Thanks,
Jason

| Employee | Mid-Year Rating |
|---|---|
| Arcara, Michelle L | |
| Andrus, L Scott | |
| Ryan, Yvonne M | |
| Booth, Rachelle A | |
| Basri, Firooz | |
| Blakely, Morris A | |
| Marts, Kevin A. | |
| Pritchett, Jacita M | |
| Hohman, Jason L | |
| Lowe, Angelia M | |
| Robinson, Douglas E. | |
| York, Delton L | |

**Possible ratings**

O

EFS

FS

MS

U

**Jason C. Parman**
Strategy Group Manager
HR Strategy & Evaluation Solutions
U.S. Office of Personnel Management

EXHIBIT M, TAB 1
PAGE 2 OF 3

2

Jason.parman@opm.gov
(816) 426-7020

The Best Strategies **Today**
    for the Best Workforce **Tomorrow**

Visit us on the web at:
www.opm.gov/services-for-agencies

EXHIBIT _M , TAB 1_
PAGE _3_ OF _3_

3

U.S. OFFICE OF PERSONNEL MANAGEMENT

NEWS
# HR Training on Demand: New Courses and Locations! Register NOW!

April 28, 2014

The Office of Personnel Management's (OPM) Human Resources Solutions' (HRS) *HR Training on Demand (HRToD)* program is expanding to new locations and offering more topics to meet broader audience needs! The HRToD program is now offering courses in **Philadelphia, PA** and **Denver, CO**, in addition to Washington, DC. New courses include **Veterans' Preference Adjudication** and **Succession Planning!** The courses offered through this program are specifically designed for HR professionals and supervisors throughout the Federal Government.

**Additional courses in more locations are coming soon.**

To register for any of these courses, or to learn more about HR Training on Demand, please email HRTrainingOnDemand@opm.gov. Seats are limited, so sign up soon!

### Veterans' Preference Adjudication

**May 6, 2014** | 8:30 am – 4:00 pm | Philadelphia, PA
$400/person

A 1-day workshop on adjudicating veterans' preference will ensure that your HR Specialists have a firm understanding of why preference is given; how to identify when preference applies; the different types of preference; when to accept late applications from preference eligibles; and how to determine which wars, campaigns, and expeditions qualify for preference. This workshop will make your HR Specialists more efficient and accurate in adjudicating veterans' preference. For more information, contact HRTrainingOnDemand@opm.gov.

### Classification Refresher

**June 10-12, 2014** | 9:00am – 4:00pm | Denver, CO
$900/person

In this 3-day refresher training, a federal classification expert will discuss current topics in basic and advanced classification (e.g., the Factor Evaluation Standard and narrative standard formats, defensible evaluation statements, statements of difference, and classifying developmental and supervisory positions). The instructor will review commonly appealed classification decisions, discuss position management issues, and provide an update from OPM's Classification Policy Section. Previous classification training or experience recommended. For more information, contact HRTrainingOnDemand@opm.gov.

### Succession Planning

**June 18-19, 2014** | 9:00am – 4:00pm | Washington, DC
$800/person



Exhibit

E

**From:** "Parman, Jason C." <Jason.Parman@opm.gov>
**To:** "Custer, Amanda" <Amanda.Custer@opm.gov>, "Blakely, Morris" <Morris.Blakely@opm.gov>, "Booth, Rachelle A." <Rachelle.Booth@opm.gov>, "Ryan, Yvonne M." <Yvonne.Ryan@opm.gov>, "Arens, Megan" <Megan.Arens@opm.gov>
**Cc:**
**Bcc:**
**Date:** Mon, 18 Jun 2018 14:05:16 +0000
**Subject:** RE: Available July 10 to testify re: Delton L. York v. OPM

All-

I've shared your availability with Joyce Harris-Tounkara in OGC. She will be getting your times scheduled with the judge. Additionally, Joyce will be reaching out to each of you to discuss the case and what you'll be asked to contribute.

To give you context, here's a quick history of this matter.

For the past few years we have decided not to promote Delton (who is currently a GS-12) to the FPL 13 in his career ladder. We have based this decision on our evaluation that he has not demonstrated the capability to successfully perform at the next higher grade level, which is a requirement for promotion. We based this on our evaluation of the competencies required at the GS-13 level, as stated in our promotion packages we submit to Leslie and me for consideration. Let me be explicitly clear: Delton's demonstrated lack of capability to perform at the next higher level is the ONLY reason he has not been promoted. I personally hired Delton at a disabled vets hiring fair. We continue to like and respect Delton, even though we disagree with his self-evaluation of his performance and capability.

In 2014, Delton filed an informal EEO complaint inside OPM, claiming we had not promoted him due to his race, age, and/or disabled veteran's status. OPM found our decision to not promote was appropriate based on numerous examples of poor or non-performance on Delton's part, and we agreed to undergo a mediation process with him.

During the mediation process, we continued to hold that Delton was not ready for promotion, but in the interest of giving him the best chance we could for him to demonstrate his readiness, we offered Delton a proposed resolution. We offered Delton the opportunity to submit his promotion package (a standard part of our process that involves him writing narrative statements, describing his relevant experience and performance on each of the competencies required to succeed at the GS-13 level). This is the same promotion package your supervisors submitted to Leslie and me, that led to all your promotions to the GS-13. Delton would then have the opportunity to have his package evaluated by a three-person panel: One manager of my choice and any two current GS-13s from our staff *of his choice*, with majority (2 of 3) ruling on whether he would be promoted or not. In other words, all Delton had to do was find two GS-13s in HRSTRAT who would say he was ready for promotion based on his package and his capability, and he would be promoted. Delton turned down this offer, saying he should simply be promoted without the same process everyone else had to undertake, due to his great performance. We continued to disagree with his assessment of his readiness, and Delton elected to pursue a formal EEO complaint process in front of a judge. This is the process under which you have been called to testify.

Morris, Yvonne, and Rachelle, I believe you'll be asked about the period of time when we had rotating acting managers in ODPC, and whether at that time you believed Delton was ready for promotion. Back then I had committed to Delton I would seek feedback from every acting manager as to whether he was ready to be promoted, and I did that, capturing your input on a spreadsheet with your evaluation of his performance during your time as acting (MS, FS, etc.) and whether or not he was ready to go to the GS-13 (all of you said not at this time ) I believe you'll also be asked about whether you believe we discriminate against non-whites. I would respectfully submit we have gladly promoted people of all backgrounds to the GS-13, as long as they demonstrate the capability to successfully perform at that level. Rachelle, I believe you'll be specifically asked about your affidavit regarding my comments about hiring a bunch of people from Missouri State University.

Amanda and Megan, I really don't know what you could be asked about, other than Megan's contact from Delton's lawyer asking about your experience with sexual harassment in the office. I don't see what that would have to do with our evaluation of Delton's capability, but please answer the questions to the best of your ability. We want to be helpful.

I hope this information is helpful. I've also attached my responses to the investigator's questions so you'll know what I've shared in the case. Please don't hesitate to reach out to me if you need additional information.

No matter what happens, please know I'm asking you to speak your mind, share your thoughts, and offer your opinions, whether those agree with mine or not. I value all of you and encourage your full participation in this process. I want nothing more than to give Delton a fair shake, for him to feel like he's had his day in court, and for the most appropriate outcome to be reached.

Regards,
Jason

**Exhibit**

**F**